Filed 5/30/13  In re Edgar M. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re EDGAR M. el al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B244882 (Super. Ct. No. J1379615, J1379616, J1379617) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES, Plaintiff and Respondent, v. MONICA M., Defendant and Appellant. | |

Monica M. (mother) appeals from the juvenile court orders terminating parental rights to her son, Edgar, and establishing adoption as his permanent plan (Welf. & Inst. Code, § 366.26).[1]  Mother contends that the finding of Edgar's adoptability is not supported by substantial evidence.[2]  We affirm.

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] The juvenile court terminated mother's parental rights to Edgar's two sisters. Mother appealed from all such orders.  Her brief, however, challenges only those orders that concern Edgar.  The court also terminated the parental rights of presumed father, Vidal M., who did not appear below, and has not appeared before this court.

BACKGROUND

In October 2010, 9-year-old Edgar lived in Santa Maria with mother and his sisters, 7-year-old Ana, and 6-year-old Norma. Vidal M. (presumed father) did not live with the family. On October 19, 2010, school personnel called mother because Norma could not talk or move her right arm. When mother picked her up, Norma was limping and making only one-word statements. Several hours later, mother took her to a hospital in Santa Maria. The doctors concluded she had had a stroke. Further testing revealed that Norma had several recent and older brain infarctions and a "non-accidental trauma vertebral artery dissection" in her neck. The doctors concluded she was a child abuse victim and contacted Santa Barbara County Child Welfare Services (CWS). CWS received inconsistent information from mother and the children regarding Norma's injuries. On November 1, 2010, CWS took the children into protective custody.

On November 3, 2010, CWS filed dependency petitions on behalf of Edgar, Ana, and Norma, alleging failure to protect and support, with sibling abuse allegations as to Ana and Edgar. (§ 300, subds. (a), (b), (g) & (j).)[3] On November 4, the juvenile court conducted detention proceedings and removed the children from mother's custody.

On January 20, 2011, the juvenile court found that the allegations of the petitions were true, declared the children dependents of the court, and ordered that they remain in out-of-home care. The court ordered supervised visitation for mother, and family reunification services.

The CWS reports showed that while mother was affectionate during her visits, she never progressed beyond supervised visitation. In December 2011, mother upset Norma and Edgar by cutting a scheduled two-hour visit to one hour because Ana was not attending. In January 2012, CWS reported that the children did not want to visit mother without supervision until they were sure she would no longer get mad at them. According to her therapist, mother lacked empathy and did not understand how her behavior could impact the children. For example, during a visit, she told them their

---

[3] CWS later dismissed the section 300, subdivision (a) allegations and accordingly filed amended petitions, most recently on January 21, 2011.

2

father was killed in Mexico. She showed them a picture of her boyfriend, said he would be their new father, and told them she was pregnant. For the next several weeks, Ana refused to visit mother, and wanted the dependency court to order her adoption. In its April 23, 2012 report, CWS advised the juvenile court that none of the children were ready to live with mother, because they were unsure if she would still be mean to them. On June 18, 2012, mother tried to kidnap Ana. Ana hid outside her foster home, crying and trembling. She and Norma were never again willing to visit mother.

The CWS September 24, 2012, section 366.26 report recommended that the court terminate parental rights and select adoption as the permanent plan for the children. Edgar had lived in four foster homes. After Edgar lived in one foster home for seven months, CWS placed him in a home with his sisters. When the parents in that home could not meet the children's needs, CWS placed them in another foster home. Edgar became increasingly aggressive toward Ana and Norma. On August 15, 2012, CWS moved Edgar into a fourth foster home with concurrent planning parents who had wished to adopt a son for many years. Edgar said that he felt like part of their family, and like a "normal kid," and wanted them to adopt him if he could not return to mother.

On October 25, 2012, the parties appeared before the juvenile court and submitted on the evidence in the section 366.26 report. The court found that it was likely that Edgar, Ana and Norma would each be adopted, and ordered the termination of parental rights.

DISCUSSION

Mother contends the juvenile court erred in finding Edgar to be adoptable. More specifically, she argues that his behavior problems made it unlikely that any family would be willing to adopt him. We disagree.

"'The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time.'" (*In re Gregory A*. (2005) 126 Cal.App.4th 1554, 1561.) In making the adoptability determination, the court focuses on whether the child's age, physical condition, and emotional state make it difficult to find an adoptive home for the child.

3

(*Ibid*.) The existence of prospective adoptive parents is an important factor because their willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parents or some other family. (*In re Josue G*. (2003) 106 Cal.App.4th 725, 733; see also *In re Brandon T*. (2008) 164 Cal.App.4th 1400, 1408.) Although the finding must be based on clear and convincing evidence, we give the order the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the order (the judgment). (*In re Josue G.*, at p. 732; *In re Gregory A.*, at p. 1562.) Substantial evidence supports the court's finding of adoptability. (*In re Josue G.*, at p. 732.)

Edgar was a good student, in overall good health, with no developmental problems. In arguing that his behavior made Edgar unadoptable, mother primarily emphasizes his negative behavior in two foster care homes. She cites his lying, stealing, hitting his sisters, and sharpening a branch to make a "knife," and his attempts to manipulate his foster parents. (AOB 13-14.) Much of that behavior occurred after mother tried to kidnap Ana, and after she bluntly told the children that their father had been killed and that her boyfriend would be their new father.[4]

Moreover, mother discounts evidence that Edgar exhibited positive behavior for much of his dependency, and asserts that like his prior foster parents, the concurrent planning parents would soon reject him. The record does not support her contention that Edgar's negative behavior is likely to reappear, or that his behavior is likely to dissuade anyone from adopting him. Edgar stayed in his first foster home for seven months, with no report that his foster family sought his removal. Before he was placed in his concurrent planning home, Edgar had frequent visits with the family, and they expressed their interest in adopting him. The foster parents told CWS that Edgar fit into their family perfectly, and called their parents "abuelita and abuelito" (grandmother and grandfather, in Spanish). According to his court appointed special advocate (CASA), Edgar responded well to the considerable amount of structure in his concurrent planning

_____

[4] Father has been missing for over five years. His family has not received concrete evidence of his death.

4

home.  The CASA observed that Edgar seemed to enjoy being the youngest family member and receiving attention from the family's two teenage daughters, as well as the parents.

Mother suggests that the juvenile court had reservations regarding Edgar's adoptability, as evidenced by the following statement it made on September 24, 2012: "I did have some questions about adoptability for Edgar at this point."  The record indicates otherwise.  The court's questions apparently concerned an error in a report.  Finally, mother claims that the order finding Edgar to be adoptable was premature, based upon the absence of an adoption report, and incomplete information regarding Edgar in the CWS reports.  She forfeited such claims by failing to raise them in the juvenile court. (See *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)

## DISPOSITION

The orders finding Edgar to be adoptable and terminating parental rights are affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P.J.

YEGAN, J.

5

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____


     Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

     Dennis A. Marshall, County Counsel, Maria Salido Novatt, Sr. Deputy County Counsel, for Plaintiff and Respondent.